Benihana, Inc. v. Benihana of Tokyo, LLC

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

—————————

August Term, 2014

(Argued: January 6, 2015     Decided: April 28, 2015)

Docket No. 14-841

—————————

BENIHANA, INC.,

*Plaintiff-Appellee*,

— v. —

BENIHANA OF TOKYO, LLC,

*Defendant-Appellant*.

—————————

B e f o r e:

LYNCH and CHIN, *Circuit Judges*, and KOELTL, *District Judge.*[*]

—————————

—————————

[*] The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

Defendant-appellant Benihana of Tokyo, LLC appeals from a February 26, 2014 order of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *J.*) granting the application of plaintiff-appellee Benihana, Inc. for a preliminary injunction in aid of arbitration of a dispute arising under the parties' license agreement.  The district court enjoined Benihana of Tokyo from: (1) selling unauthorized food items at the restaurant it operates pursuant to the license agreement; (2) using certain trademarks in connection with the restaurant in a manner not approved by the license agreement; and (3) arguing to the arbitral panel, if it rules that Benihana of Tokyo breached the license agreement, that Benihana of Tokyo should be given additional time to cure any defaults.  We conclude that the district court was within its discretion in granting the first and second components of the injunction.  However, the district court erred in restricting the arguments Benihana of Tokyo may make to the arbitral panel.

AFFIRMED IN PART AND REVERSED IN PART.

———————

ALAN H. FEIN, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Florida (Joseph A. Munn and Andrea N. Nathan, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.,

2

Miami, Florida, and Nicole Gueron, Clarick Gueron Reisbaum LLP, New York, New York, *on the brief*), *for Plaintiff-Appellee* Benihana, Inc.

JOSEPH L. MANSON III, Law Offices of Joseph L. Manson III, Alexandria, Virginia, *for Defendant-Appellant* Benihana of Tokyo, LLC.

GERARD E. LYNCH, *Circuit Judge*:

Defendant-appellant Benihana of Tokyo, LLC ("Benihana of Tokyo") appeals from a February 26, 2014 order of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *J.*) granting the application of plaintiff-appellee Benihana, Inc. ("Benihana America") for a preliminary injunction in aid of arbitration of a dispute arising under the parties' license agreement. The district court enjoined Benihana of Tokyo from: (1) selling unauthorized food items at the restaurant it operates pursuant to the license agreement; (2) using certain trademarks in connection with the restaurant in a manner not approved by the license agreement; and (3) arguing to the arbitral panel, if it rules that Benihana of Tokyo breached the license agreement, that Benihana of Tokyo should be given additional time to cure any defaults.

The district court did not abuse its discretion with respect to the menu offering or trademark use injunctions, because it reasonably concluded that each of the relevant factors favored Benihana America. But it erred in enjoining Benihana of Tokyo from arguing to the arbitral panel for an extended cure period. When a dispute is properly before an arbitrator, a district court should not interfere with the arbitral process on the ground that, in its view of the merits, a particular remedy would not be warranted. Benihana America may challenge an arbitrator's decision in court only after it has been issued. It may not subvert its agreement to arbitrate by obtaining a determination from a district court in advance that there are no grounds for the arbitrator to grant a particular remedy.

We therefore AFFIRM IN PART and REVERSE IN PART the order of the district court.

## BACKGROUND

I. The License Agreement

This case arises from a dispute between the parties resulting from the 1994 corporate division of the well-known Benihana restaurant chain. Under the parties' Amended and Restated Agreement and Plan of Reorganization (the "ARA"), Benihana America received the right to operate Benihana restaurants

and use Benihana trademarks in the United States, Latin America, and the Caribbean, while Benihana of Tokyo received those rights for all other territories. The one exception to this clean split was Hawaii: the ARA provided that Benihana America would grant Benihana of Tokyo a license to continue operating an existing Benihana restaurant in Honolulu.

Accordingly, on May 15, 1995 the parties entered into a License Agreement (the "Agreement"), governed by New York state law, granting Benihana of Tokyo a license and franchise to operate Benihana restaurants in Hawaii, subject to the terms of the Agreement. In the Agreement, Benihana of Tokyo acknowledged the "necessity of operating the [restaurant] in conformity with [Benihana America's] standards and specifications," Joint App'x at 31-32, many of which are spelled out in the Agreement. Most relevant here, the Agreement restricts Benihana of Tokyo's menu selection and use of Benihana trademarks. Article 6.3 requires Benihana of Tokyo to "sell or offer for sale only such products and services as have been expressly approved for sale in writing" by Benihana America, provided that "such approval shall not be unreasonably withheld." Id. at 42-43. Similarly, under Article 8.1(c), Benihana of Tokyo agreed "[t]o advertise, sell or offer for sale only those items which are sold by [Benihana

5

America] in its company-owned restaurants or such other products as are approved by [Benihana America] in writing, which shall not be unreasonably withheld, prior to offering the same for sale." Id. at 44-45. Article 5.2 provides that "[a]ny and all advertising . . . or other matter employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo' or the [Benihana] 'flower' symbol shall be submitted to [Benihana America] for its approval prior to publication or use. [Benihana America] shall not unreasonably withhold approval for any such publication or use." Id. at 40.

The Agreement also sets forth conditions and procedures governing termination. Under Article 12.1, Benihana America has good cause to terminate the Agreement in the event of either: (I) a violation of "any . . . substantial term or condition of th[e] Agreement [that Benihana of Tokyo] fails to cure . . . within thirty days after written notice from [Benihana America]"; or (ii) "three notices [by Benihana America] of any default hereunder (and such defaults are thereafter cured), within any consecutive twelve month period." Id. at 52-53. The Agreement also provides that violation of certain articles — including Article 5.2 restricting Benihana of Tokyo's trademark use and Article 8.1(c) restricting the items Benihana of Tokyo may advertise or sell — "would result in irreparable

6

injury to [Benihana America] for which no adequate remedy at law may be available" and for which Benihana America may obtain "an injunction against [such] violation . . . without the necessity of showing actual or threatened damage." Id. at 48.

Finally, Article 13 contains two arbitration provisions:

13.1    If this Agreement shall be terminated by [Benihana America] and [Benihana of Tokyo] shall dispute [Benihana America's] right of termination, or the reasonableness thereof, the dispute shall be settled by arbitration at the main office of the American Arbitration Association in the City of New York in accordance with the rules of said association and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitration panel shall consist of three (3) members, one (1) of whom shall be chosen by [Benihana America], and (1) by [Benihana of Tokyo] and the other by the two (2) so chosen.

13.2    In the event that any other dispute arises between the parties hereto in connection with the terms or provisions of this Agreement, either party by written notice to the other party may elect to submit the dispute to binding arbitration in accordance with the foregoing procedure. Such right shall not be exclusive of any other rights which a party may have to pursue a course of legal action in an appropriate forum. Enforcement of any arbitration award, decision or order may be sought in any court having competent jurisdiction.

Id. at 55-56.

7

## II.   The Licensing Disputes

Things proceeded amicably enough under the Agreement for over fifteen years. But in 2012 Benihana America was purchased by Angelo Gordon & Co., which proved to be a more hands-on licensor. In May 2013, Benihana America wrote to Benihana of Tokyo that it had recently learned that Benihana of Tokyo was selling hamburgers — called "BeniBurgers" — at its Honolulu location. Benihana America reminded Benihana of Tokyo that the Agreement required Benihana America's approval of new menu items, noted that hamburgers were not an authorized menu item, and demanded that the hamburgers be removed from the menu. When no remedial action was forthcoming, Benihana America sent a second letter on July 30, 2013 notifying Benihana of Tokyo that it was in breach of the Agreement and had thirty days to cure.

After receiving two extensions of the cure period from Benihana America, Benihana of Tokyo brought suit on September 24, 2013 in the New York State Supreme Court seeking an injunction to stay the running of the cure period pending arbitration of whether selling hamburgers violated the Agreement.[1]

---

[1] When Benihana of Tokyo brought suit, neither party had initiated an arbitration proceeding. But New York law provides that "[t]he supreme court . . . may entertain an application for . . . a preliminary injunction in connection with an

8

Benihana America promptly removed the suit to federal court. At a hearing before the district court on October 1, 2013, Benihana of Tokyo did not dispute that the Agreement prohibited selling hamburgers but argued that Benihana America had waived its right to enforce that prohibition by failing to monitor the Honolulu restaurant for many years. The district court rejected the waiver argument as precluded by the plain language of the Agreement,[2] found that each of the relevant factors weighed against staying the cure period, and accordingly denied the motion. The court also rejected Benihana of Tokyo's backup request at oral argument for "a very short stub period for the cure," explaining that it had "applied the standards and determined that they don't justify extending the cure period." Joint App'x at 70. Later that day, counsel for Benihana of Tokyo submitted to Benihana America certain financial documents required by the Agreement and represented that Benihana of Tokyo "will not be selling

---

arbitration that is pending or that is to be commenced," provided that "[i]f an arbitration is not commenced within thirty days of the granting of the provisional relief, the order granting such relief shall expire and be null and void." N.Y. C.P.L.R. § 7502(c).

[2] Article 17.2 of the Agreement provides that "[n]o failure of [Benihana America] to . . . insist upon strict compliance by [Benihana of Tokyo] of any obligation hereunder . . . shall constitute a waiver of [Benihana America's] right to demand exact compliance with the terms hereof." Joint App'x at 58.

9

hamburgers in Hawaii." Id. at 99. On December 13, 2013 Benihana America sent another notice of breach based on asserted deficiencies in the submitted financial documentation and violations of the Agreement's advertising restrictions.

On January 13, 2014, the day on which the latest cure period expired, Benihana of Tokyo filed an arbitration demand with the American Arbitration Association seeking "a declaratory judgment that the claimed defaults do not exist, but, if the panel finds that the claimed defaults do exist, then [Benihana of Tokyo] requests sufficient time to cure the alleged defaults." Id. at 20.

Despite its assurances to the contrary, Benihana of Tokyo continued to sell hamburgers at its Honolulu location. An onsite inspection by Benihana America on January 21, 2014 allegedly revealed that, in place of the BeniBurger, Benihana of Tokyo was now serving a "Tokyo Burger," as well as a "Beni Panda" children's meal consisting of two mini-burgers served with rice and arranged to resemble a panda face. These menu offerings were advertised using the Benihana name and other trademarks in a manner allegedly not authorized by the Agreement.

That discovery prompted Benihana America on February 5, 2014 to send Benihana of Tokyo a notice of termination of the Agreement effective February

15, 2014.  The notice asserted that good cause for termination existed under either prong of Article 12.1: (I) failure to cure within thirty days; and (ii) three notices of default within twelve months.  The notice also stated that Benihana of Tokyo's "attempt to relitigate [before an arbitral panel] the question of whether [Benihana of Tokyo] may wait to cure until after the arbitration 'panel finds that the claimed defaults do exist,' an argument rejected by [the district court] in October, suggests a level of contempt so extreme that termination of the License Agreement is [Benihana America's] only option."  Joint App'x at 105.  That same day, Benihana America filed a counterclaim in the arbitration seeking confirmation of its termination.

Two days later,  Benihana America petitioned the district court for injunctive relief in aid of arbitration pursuant to Federal Rule of Civil Procedure 65, seeking to enjoin Benihana of Tokyo:

> (1) from selling hamburgers or other unauthorized food items on the premises of the Benihana[] restaurant it operates in Hawaii pursuant to the License Agreement, or using or publishing advertisements, publicity, signs, decorations, furnishings, equipment, or other matter employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo,' or the 'flower' symbol that have not been approved in accordance with Article 5.2 of the License Agreement; and (2) from arguing to

11

the arbitration panel that it be permitted to cure any defaults if the arbitrators rule that [Benihana of Tokyo] breached the License Agreement.

Joint App'x at 24. The petition argued that the "advertising and the sale of these items are clear and blatant violations . . . of the License Agreement." Id. at 22. Because it would be irreparably harmed by the continuing violations and was likely to succeed on the merits before the arbitral panel, Benihana America sought "provisional relief" so that the panel's "decision and award . . . will not be rendered ineffectual." Id. at 24. Benihana America also argued that if either termination condition under Article 12.1 were met, then it was entitled to terminate without an additional cure period, and that Benihana of Tokyo should therefore be prohibited from arguing to the arbitrators for an extended cure period to which it was plainly not entitled under the Agreement.

In its three-page brief opposing the petition, Benihana of Tokyo creatively argued that it was not violating the Agreement at all. It asserted that the Tokyo Burger was sold not in the restaurant but instead "from an outside non-exclusive area," while the Beni Panda was "not itself a burger" but a "fried rice dish" (albeit one that included two mini-burgers shaped as panda ears). No. 14-cv-792 (PAE), Doc. No. 14, at 2. But, "in the spirit of cooperation," Benihana of Tokyo

pledged (again) not to sell those items pending arbitration. Id. Benihana of Tokyo contended that because the only advertising Benihana America sought to enjoin pertained to the sale of these items, its pledge to discontinue these items pending arbitration mooted the advertising component of Benihana America's petition. Lastly, Benihana of Tokyo argued that enjoining it from arguing to the arbitrators for an extended cure period "would impermissibly involve the Court in the merits of the arbitration and the powers of the arbitrators." Id. at 3.

The district court granted Benihana America's petition in a ruling from the bench on February 16, 2014, enjoining Benihana of Tokyo from:

> 1. Selling hamburgers or other unauthorized food items on the premises of, or in any manner in connection with, the Benihana restaurant it operates in Hawaii pursuant to a license from [Benihana America].

> 2. Using or publishing, in connection with the Benihana restaurant it operates in Hawaii pursuant to a license from [Benihana America], advertisements, publicity, signs, decorations, furnishings, equipment, or other matter employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo,' or the 'flower' symbol that have not been approved in accordance with Article 5.2 of the License Agreement.

> 3. Arguing to the arbitration panel, in the event the panel rules that it breached the License Agreement so as to justify its termination, that it should be permitted to cure any defaults.

13

Joint App'x at 188-89.

As to the hamburgers, the court found that each of the four preliminary injunction factors favored Benihana America. It found a likelihood of success "clear beyond peradventure" because serving hamburgers without Benihana America's consent plainly violated the Agreement. Id. at 177. The court also found that "the sale of these burgers under a Benihana name will irreparably harm [Benihana America] by undermining [its] distinct image . . . . Benihana does not 'do' burgers; its niche is to sell higher-end cuisine, like steak and seafood." Id. at 178. The balance of hardships likewise favored Benihana America, because it "ought to be no hardship whatsoever for Benihana of Tokyo to refrain from selling burgers that it has no legal right to sell." Id. at 179. Finally, the court found that the public interest, while not seriously implicated, was served by assuring that lawful agreements are enforced.

The court's analysis for the trademark use injunction was "much the same" as for the hamburgers. Id. at 181. Because the request would enjoin only use of the trademarks not authorized under the Agreement, the court found that success on the merits was "guarantee[d]" and that use of Benihana trademarks in violation of the Agreement "will irreparabl[y] harm [Benihana America's] brand

14

and reputation just as much, if not more, than will the sale of unauthorized burgers." Id. at 182. As with the hamburger injunction, the last two factors favored Benihana America because complying with the Agreement was not a hardship and the public interest would be served by enforcing the Agreement.

Turning to the injunction preventing Benihana of Tokyo from arguing to the arbitral panel for an extended cure period, the district court found that Benihana America was "highly likely to succeed on the merits," because the court had "previously denied Benihana of Tokyo's TRO application for an extension of the cure period." Id. at 184. "[R]eviewing the issue afresh," the court explained that it "cannot identify, and Benihana of Tokyo has not identified, any basis in the licensing agreement on which a court or an arbitrator could lawfully give Benihana of Tokyo a cure period beyond that in the agreement." Id. The court noted that the Agreement "gives Benihana of Tokyo a 30-day cure period" and reasoned that the Agreement "does not afford a basis for a court or an arbitrator to extend that period, much less following a hypothetical finding by an arbitral panel of a material breach by Benihana of Tokyo justifying termination." Id. The court also found that Benihana America "would be irreparably harmed if Benihana of Tokyo somehow wrongly convinced the arbitrators to grant it a

15

further cure period despite its material breach warranting termination." Id. at 184-85.

Benihana of Tokyo timely appealed.

**DISCUSSION**

Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration. See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1052-53 (2d Cir. 1990). The standard for such an injunction is the same as for preliminary injunctions generally. Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir. 1984). A party seeking a preliminary injunction must demonstrate: (1) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction. Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

16

We review the grant of a preliminary injunction for abuse of discretion, reversing only if the injunction is based on an error in law or a clearly erroneous assessment of the evidence, or if it cannot be located within the range of permissible decisions. <u>Oneida Nation v. Cuomo</u>, 645 F.3d 154, 164 (2d Cir. 2011).

I.    <u>Injunction Against Unauthorized Menu Items and Use of Trademarks</u>

The first two components of the district court's injunction do not require extensive discussion, and because Benihana of Tokyo's arguments as to them largely overlap, we consider them together.  We conclude that the district court acted within its discretion in finding that each of the factors for a preliminary injunction favored Benihana America and accordingly in granting those portions of the injunction.

A.    <u>Likelihood of Success on the Merits</u>

Benihana of Tokyo concedes what it describes as "technical violations of two ancillary provisions" of the licensing agreement — namely, the menu and advertising restrictions.  Appellant's Br. at 6.  But, it contends, when assessing likelihood of success on the merits, that the question is not simply whether it has breached the Agreement, but whether its breaches were grounds for termination. Assuming that this is indeed the correct question, the answer depends largely on

17

the accuracy of Benihana of Tokyo's characterization of the violations as "technical" and the provisions as "ancillary." Benihana of Tokyo does not fare well on either front.

The district court properly found that, far from committing merely trivial violations, Benihana of Tokyo was "blatantly not complying with the license agreement," even after it "could not have been more clear at [an earlier] hearing in acknowledging that it was forbidden under the license agreement to sell burgers," Joint App'x at 175, 178, and even after it represented that it would cease doing so. Instead, Benihana of Tokyo continued to flout the terms of the Agreement, relying on, as the district court aptly put it, "justification[s] utterly and unusually unconvincing," id. at 176, such as that burgers with rice and shaped as "panda ears" are not burgers. The menu item and advertising restrictions of the Agreement were clear, and Benihana of Tokyo was clearly violating them.

Nor do we agree with Benihana of Tokyo that the breached provisions are "ancillary." Control over menu and advertising is presumably a central concern for a licensor of a restaurant brand, and the Agreement reveals precisely such a concern in this case. The Agreement begins by explaining that Benihana America

18

has "created and developed a unique system of high-quality restaurants" and that Benihana of Tokyo "understands and acknowledges . . . the necessity of operating the business franchised hereunder in conformity with [Benihana America's] standards and specifications." Id. at 31-32. Moreover, the Agreement included the menu and advertising restrictions among the provisions for violation of which Benihana America could seek an injunction without showing irreparable harm.

As a fallback, Benihana of Tokyo contends that Benihana America is not likely to prevail in the arbitration because, under the Agreement, *had* it submitted the menu items and advertisements for approval, Benihana America could not have unreasonably withheld its consent. Thus, Benihana of Tokyo argues, its advertisements and "burger sales are impermissible only if [Benihana America] acts reasonably in prohibiting [the advertisements and] burger sales to begin with." Appellant's Br. at 36. We express no view on whether Benihana America's withholding such consent would have been reasonable, for that question is beside the point. The Agreement required Benihana of Tokyo to seek consent *before* taking these actions. Failure to do so put Benihana of Tokyo in breach; it also meant that Benihana America's obligation not to withhold its

19

approval unreasonably was never triggered.  We therefore reject Benihana of Tokyo's contention that Benihana America's conduct makes it unlikely to prevail in the arbitration.

### B.    Irreparable Harm

Nor did the district court abuse its discretion in finding that "the sale of these burgers under a Benihana name will irreparably harm [Benihana America] by undermining the distinct image it has worked so hard to create in the minds of consumers."  Joint App'x at 178.  Benihana of Tokyo argues that Benihana America has offered no "concrete evidence" that the unauthorized menu items would cause irreparable harm and that because "many high-end restaurants regularly sell hamburgers at lunch, it is not at all axiomatic that serving hamburgers would in any way tarnish [Benihana America] or constitute a deviation from quality standards."  Appellant's Br. at 30.  But, as discussed above, control over menu selection appears central to the Agreement.  The district court was not required to demand expert testimony or consumer surveys before crediting Benihana America's argument that "Benihana does not 'do' burgers," and that serving hamburgers undermined its distinct image — a conclusion supported by common sense and the Agreement.  The district court

20

also properly concluded that if the unauthorized sales continue, Benihana America "would suffer substantial harm to its reputation that is 'not calculable nor precisely compensable.'" Joint App'x at 178-79, citing Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir. 1985).

Moreover, the licensing agreement provides that a violation of the prohibition on "sell[ing] or offer[ing] for sale" items not "approved by [Benihana America] in writing" would "result in irreparable injury" for which Benihana America "shall be entitled . . . [to] an injunction . . . without the necessity of showing actual or threatened damage." Joint App'x at 44-45, 48. As the district court noted, under our precedent such an "irreparable harm" provision in the parties' agreement, while not controlling, is "relevant evidence that can help support a finding of irreparable injury." Id. at 179, citing N. Atl. Instruments, Inc. v . Haber, 188 F.3d 38, 49 (2d Cir. 1999).

Similarly, Benihana of Tokyo argues that Benihana America failed to present sufficient evidence of irreparable harm from the unauthorized advertising. Specifically, it asserts that Benihana America provided "no evidence of customer confusion," and instead "merely presented pictures of [Benihana of Tokyo's] unauthorized advertising and asked the court to conclude that confused

21

customers would probably think [Benihana America] had sponsored the ads." Appellant's Br. at 31. But before the district court, Benihana of Tokyo argued only that with its "agreement not to sell the Tokyo Burger or the Beni-Panda during the pendency of the arbitration, this issue is moot" because the only unauthorized advertising concerned those items. No. 14-cv-792 (PAE), Doc. No. 14, at 2. Because Benihana of Tokyo in its brief and in oral argument opposing the injunction application failed to contest the sufficiency of the evidence supporting irreparable harm from unauthorized advertisements, that argument is waived on appeal. See In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 132-33 (2d Cir. 2008).

C. Balance of Hardships and Public Interest

We also agree with the district court that it is no hardship for Benihana of Tokyo to refrain from menu offerings and trademark uses that are not permitted under the Agreement, whereas Benihana America faces harm to its brand from the Agreement's violation. Finally, we agree that, to the extent it is implicated, the public interest here is served by the enforcement of the parties' lawful agreement, and that therefore this factor too favors Benihana America.

22

II.  Injunction Against Arguing to Arbitrator for Extended Cure Period

Benihana of Tokyo argues that the district court exceeded its limited power to issue injunctive relief only as necessary to preserve the status quo pending arbitration. It notes that the parties agreed to arbitrate disputes regarding termination, with no explicit limitation on the arbitrators' power to resolve such disputes. Thus, Benihana of Tokyo maintains, its argument for an extended cure period poses a question for the arbitrators rather than the court. It contends that, by restricting the arguments it may make in arbitration, the court delved deeply into the merits and thereby "invad[ed] the proper province of the arbitrators." Appellant's Br. at 3. Finally, it argues that any remedy granted by an arbitrator may be challenged in the district court only after it has been issued, and not ex ante.

Benihana America counters that it is for the court to determine in the first instance what issues and corresponding remedies properly may be considered by the arbitrators. Benihana America asserts that because the Agreement provides no basis for an extended cure period once termination has been found warranted, the court was within its discretion in enjoining Benihana of Tokyo from arguing for a remedy to which it had no arguable right. In other words, Benihana

23

America maintains that awarding such a remedy is outside the scope of the arbitrators' authority and is therefore outside the scope of the parties' agreement to arbitrate.

"[T]he arbitrability of a given issue is a question for the court unless there is 'clear and unmistakable' evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198-99 (2d Cir. 1996) (internal quotation marks omitted). "The scope of an arbitrator's authority . . . generally depends on the intention of the parties to an arbitration, and is determined by the agreement . . . ." ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 85 (2d Cir. 2009) (internal quotation marks omitted). "[E]ven absent an express contractual commitment of the issue of arbitrability to arbitration, a referral of 'any and all' controversies reflects such a 'broad grant of power to the arbitrators' as to evidence the parties' clear 'inten[t] to arbitrate issues of arbitrability.'" Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003), quoting PaineWebber, 81 F.3d at 1199-1200); see also, Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 43, 46 (1997) (holding that an agreement governed by New York law that states that

24

"[a]ny controversy . . . shall be settled by arbitration" clearly and unmistakably reserves the decision of arbitrability for the arbitrator) (alterations in original) (internal quotation marks omitted).

In this case, Article 13.1 of the Agreement provides that if Benihana of Tokyo disputes the "right of termination, or the reasonableness thereof, the dispute shall be settled by arbitration." Joint App'x at 55. Article 13.2 then provides that if "*any other dispute* arises between the parties hereto in connection with the terms or provisions of this Agreement, either party by written notice to the other party may elect to submit the dispute to binding arbitration." Id. (emphasis added). Once a party has elected to submit such dispute to arbitration, these two clauses taken together grant the arbitrators jurisdiction over disputes concerning the Agreement that is "inclusive, categorical, unconditional and unlimited." PaineWebber, 81 F.3d at 1199. Accordingly, we read the plain language of the Agreement to clearly indicate that the parties intended to grant the arbitrator the power to decide questions of arbitrability, including whether Benihana of Tokyo's claim for an extended cure period in lieu of termination, is arbitrable.

The parties, however, appear to believe the contrary. Benihana America briefly asserts that the question of arbitrability is for the courts, see Appellee's Br. at 34, and Benihana of Tokyo nowhere contests that assertion, simply arguing on the merits that the question it desires to raise is arbitrable. It is therefore arguable that the parties have agreed to submit the question of the arbitrability of Benihana of Tokyo's extended cure period argument to us for decision. See S&R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 83-85 (2d Cir. 1998); Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25-27 (2d Cir. 1995).

We need not decide whether Benihana of Tokyo's failure to contest this issue waives the broad arbitration clause in the Agreement, since we would in any event conclude that the merits of the extended cure issue are for the arbitrators to decide. For the same reason that we interpret the arbitration agreement to encompass the issue of arbitrability — namely, that it covers any and all disputes arising under the Agreement, once either party has elected to arbitrate that dispute — we would conclude that it also encompasses Benihana of Tokyo's argument for an extended cure period. Indeed, this conclusion follows *a fortiori* because in interpreting the scope of the agreement to arbitrate we

26

"reverse[] the presumption" that applies to the issue of who decides arbitrability, such that "any doubts concerning the scope of arbitrable issues [are] resolved in favor of arbitration." Shaw Grp. Inc., 322 F.3d at 120 (internal quotation marks omitted). "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular [claim] should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (alterations and internal quotation marks omitted). It is arguable, to say the least, that a dispute regarding whether Benihana of Tokyo may receive an extended cure period in lieu of termination falls within an agreement to arbitrate any and all disputes arising under the Agreement.

Benihana America's argument that the issue of an extended cure period is outside the scope of the agreement to arbitrate is in reality an argument that the Agreement provides no basis for extending the cure period. Put differently, Benihana America's position is not that an *arbitrator* cannot grant the remedy Benihana of Tokyo seeks, but rather that the remedy cannot be granted by *either a court or an arbitrator*, because the Agreement does not provide for such a remedy.

27

The district court saw the issue in these same terms, concluding that the Agreement "does not afford a basis for a court or an arbitrator to extend that period." Joint App'x at 184. At bottom, Benihana America's position concerns what decision may be reached — that is, it concerns the proper interpretation of the Agreement — not who may reach it, and is therefore a merits argument masked as a jurisdictional one. Thus, the actual question before us is whether, when the parties have agreed to submit a dispute to arbitration, a court may enjoin a party from seeking a particular remedy in arbitration if, in the court's assessment, that remedy would have no basis in the parties' agreement.

We hold that it may not. Once arbitrators have jurisdiction over a matter, "any subsequent construction of the contract and of the parties' rights and obligations under it" is for the arbitrators to decide. McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988). If the parties have agreed to arbitrate a dispute, a court has "no business weighing the merits of the [claims], considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all [claims] to arbitration, not merely those which the court will deem meritorious." AT&T

Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 650 (internal quotation marks omitted).  Although the district court enjoined Benihana of Tokyo from arguing for an extended cure period, rather than directly prohibiting the arbitrators from awarding such a remedy, a dispute obviously cannot be "submit[ted]" to the arbitrators for decision, as contemplated by AT&T, if a party is prohibited from arguing its position on that issue to the arbitrators.  This portion of the injunction is thus fully equivalent to a ruling that the arbitrator may not grant Benihana of Tokyo an extended cure period.  "Whether 'arguable' or not, indeed even if it appears to the court to be frivolous," a dispute concerning the Agreement "is to be decided, not by the court . . . but as the parties have agreed, by the arbitrator."  Id. at 649-50.  While the district court believed that the Agreement provided no basis to extend the cure period, that question was nevertheless for the arbitrators in the first instance.  Benihana America's opportunity to challenge a particular remedy in the district court would come after the arbitrators had granted the remedy, not before.

To support its position that a court may issue an injunction to prevent an arbitrator from awarding a remedy without basis in the parties' agreement, Benihana America relies heavily on this Court's decision in 187 Concourse

29

_Assocs. v. Fishman_, 399 F.3d 524 (2d Cir. 2005). In that case, an employer and a terminated employee submitted two questions to an arbitrator pursuant to a collective bargaining agreement ("CBA"): "Was the [employee] discharged for just cause? If not, what shall the remedy be?" _Id_. at 526 (internal quotation marks omitted). Despite finding that the employer "had no option but to terminate" the employee, the arbitrator ordered the employee restored "to his prior . . . position with a final warning." _Id_. We held that the arbitrator had exceeded its authority by reinstating the employee. We explained that "the arbitrator's authority was limited by both the CBA and the questions submitted by the parties for arbitration. . . . Upon a finding of just cause, there was nothing further to be done. The arbitrator had no authority, under either the CBA or the submission, to fashion an alternative remedy." _Id_. at 527. Benihana America contends that the arbitrators' power here is similarly limited to determining whether the Agreement was properly terminated. If it was properly terminated, Benihana America argues, then as in 187 Concourse the arbitrators may not proceed to fashion an alternative remedy, such as extending the cure period.

Benihana America's argument ignores a critical distinction between 187 Concourse and this case: in 187 Concourse, we held that the arbitrator had

30

exceeded its authority *after* it had rendered its decision. Here, by contrast, Benihana America seeks a ruling *ex ante* that, in a matter properly submitted to arbitration, ordering a particular remedy would exceed the arbitrators' authority.[3] Tellingly, Benihana America has not cited, and we have not found, any precedent for a court holding that a particular remedy may not be awarded by an arbitrator *before* the arbitrator has actually awarded that remedy. On the contrary, courts that have determined that a remedy exceeded the scope of an arbitrator's power have done so exclusively after the arbitrator's ruling.

---

[3] 187 Concourse is distinguishable in other respects as well. First, the question submitted to the arbitrators in this case is not on its face a binary one of whether the Agreement was properly terminated, as it was in 187 Concourse. Benihana of Tokyo filed an arbitration demand for "a declaratory judgment that the claimed defaults do not exist, but, if the panel finds that the claimed defaults do exist, then [Benihana of Tokyo] requests sufficient time to cure the alleged defaults." Joint App'x at 20. Thus, the question of whether the arbitrator may properly grant Benihana of Tokyo an extended cure period has in fact been presented to the arbitrators. Second, the Agreement here contains no explicit limitation on the arbitrators' power, whereas in 187 Concourse the CBA provided that the "arbitrator shall have no authority to add to, subtract from, or modify the provisions of this Agreement and shall confine his decision to a determination based on the facts presented." 399 F.3d at 526 (internal quotation marks omitted). We note these distinctions merely to emphasize that we do not suggest that 187 Concourse would compel vacatur of a hypothetical arbitral award granting an extended cure period. In keeping with our holding here, we express no view on that question.

That is hardly coincidental. Prohibiting a court's assessment of the merits until after the arbitral decision has been rendered is consistent with the structure of the Federal Arbitration Act ("FAA") and with the "strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). The FAA contains no provision for a court's pre-arbitration assessment of whether a particular remedy is supported by the parties' agreement and therefore may be awarded by the arbitrator. Instead, § 10(a)(4) of the FAA permits a court to *vacate* an arbitral award, among other grounds, "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). That process furthers the FAA's "principal purpose" of "ensur[ing] that private arbitration agreements are enforced according to their terms," AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011) (internal quotation marks omitted), by seeing that disputes that parties have agreed to arbitrate are indeed decided by an arbitrator. New York law is to the same effect, because the "firmly established . . . public policy of New York State favors and encourages arbitration . . . . [and aims] to interfere as little as possible with the freedom of consenting parties" to achieve that objective. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 82 N.Y.2d 47, 53-54 (1993).

32

Consequently, "[t]his Court has repeatedly recognized the strong deference appropriately due . . . the arbitral process." Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 138 (2d Cir. 2007). When parties agree to arbitrate a dispute, it undermines and discredits the arbitral process for a district court to enjoin parties from advancing arguments in arbitration for fear that the arbitrators might wrongly accept them. Here, the district court granted an injunction after finding that Benihana America "would be irreparably harmed if Benihana of Tokyo somehow wrongly convinced the arbitrators to grant it a further cure period despite its material breach warranting termination." Joint App'x at 184-85. Such a concern is not a proper ground for finding irreparable harm or for granting an injunction. If a court determines the merits of the parties' arguments in advance of a pending arbitration, "the ostensible purpose for resort to arbitration, i.e., avoidance of litigation, would be frustrated." Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir. 1960).

Considerations of judicial economy and efficient dispute resolution also counsel against a district court's assessment of the merits of a pending arbitration. If a remedy sought by a party in arbitration indeed finds no support

33

in the parties' agreement, the district court has no reason to presume that the arbitrators are likely to grant it. There is little to be gained from a district court's opining on a hypothetical award that likely will never materialize. Moreover, for a court to preview the issues that a party seeks to present to the arbitrator, and decide the merits of some of those issues in advance, risks delaying the arbitration process, and divides the issues to be resolved between two decision-makers, where the parties selected a unitary dispute resolution process in the hopes that such a procedure would be more expeditious than litigation in court.

Refraining from a view on the merits until after an arbitral decision has been rendered will also aid the district court in applying the proper highly-deferential standard of review to those decisions. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision." ReliaStar Life Ins. Co. of N.Y., 564 F.3d at 86 (internal quotation marks omitted). "[T]he sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 (2013). To apply the appropriate

34

standard of deference, it will be helpful for the court to know (at least in cases in which the arbitrator chooses to give its reasons) exactly what the arbitrator decided and why, rather than anticipating the arguments or reaching its own conclusions.

The benefit of having the arbitrator's decision is particularly important given that arbitrators are generally afforded greater flexibility in fashioning remedies than are courts. "Where an arbitration clause is broad," as it is here, "arbitrators have the discretion to order remedies they determine appropriate, so long as they do not exceed the power granted to them by the contract itself." Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 262 (2d Cir. 2003). "[I]t is not the role of the courts to undermine the comprehensive grant of authority to arbitrators by prohibiting them from fashioning awards or remedies to ensure a meaningful final award." Reliastar Life Ins. Co., 564 F.3d at 86 (internal quotation marks omitted). Like federal law, "New York law gives arbitrators substantial power to fashion remedies that they believe will do justice between the parties . . . . [and] [u]nder New York law arbitrators have power to fashion relief that a court might not properly grant." Sperry Int'l Trade, Inc. v. Gov't of Israel, 689 F.2d 301, 306 (2d Cir. 1982). If the court is correct that the

35

Agreement provides no basis for an extension of the cure period, a question on which we express no view, the arbitrators presumably will not grant such relief; if the arbitrators do grant such relief, they may well explain their reasoning in a manner that will persuade the court that such relief is in fact permissible.

Because the parties' dispute had been submitted to arbitration, the district court, rather than independently assessing the merits, should have confined itself to preserving the status quo pending arbitration. Restricting the relief Benihana of Tokyo could seek in arbitration undermined rather than aided the arbitral process, and therefore that portion of Benihana America's petition for an injunction should have been denied.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the order of the district court insofar as it enjoins Benihana of Tokyo, pending resolution of the arbitration, from selling hamburgers or other unauthorized menu items or engaging in unapproved advertising at its Hawaii location, and we REVERSE that order insofar as it enjoins Benihana of Tokyo from arguing to the arbitrators for an extended cure period.